**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT**

| | |
|---|---|
| WALTER KIDDE PORTABLE EQUIPMENT, INC. | Civil Action No. 1:08-cv-03641 |
| Plaintiff/Counter-Defendant, | Judge Harry D. Leinenweber |
| | Magistrate Judge Maria Valdez |
| v. | |
| UNIVERSAL SECURITY INSTRUMENTS, INC. *et al.*, | JURY TRIAL DEMANDED |
| Defendants/Counter-Plaintiffs, | |
| v. | |
| UNITED TECHNOLOGIES CORP. | |
| Third-Party Defendant. | |

**WALTER KIDDE PORTABLE EQUIPMENT, INC.'S
ANSWER TO USI'S SECOND AMENDED COUNTERCLAIMS**

Plaintiff, Walter Kidde Portable Equipment, Inc. ("Kidde"), hereby responds to the

counterclaims alleged by Defendants, Universal Security Instruments, Inc. and USI Electric, Inc.

(collectively "USI") as follows:

**JURISDICTION AND VENUE**

17.    Defendants Counter-Plaintiffs, Universal Security Instruments, Inc. and USI
Electric, Inc., (collectively "USI") plead the following counterclaims against Plaintiff, Counter-
Defendant, Walter Kidde Portable Equipment, Inc. (formally Maple Chase Company)("Kidde")
and affirmative claims against its parent company, United Technologies Corporation ("UTC"),
which arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Patent
Statute, 35 U.S.C. §§ 101 *et seq,* Section 2 of the Sherman Act, 15 U.S.C. § 2, Illinois Uniform
Deceptive Trade Practices Act , 815 Ill. Comp. Stat. § 510/1 et seq., and under 28 U.S.C. §§
1337 and 1338(a).

**RESPONSE:**

Answering paragraph 17 as to Kidde only, admitted that USI has asserted Counterclaims against Kidde and that USI has also asserted a Third Party Complaint against UTC, all of which purport to arise under the patent and antitrust laws of the United States and the laws of Illinois, but denied that USI is entitled to any of the relief which it has requested by way of such Counterclaims or Third Party Complaint.

18.     There is a justiciable controversy concerning the invalidity, unenforceability, and non-infringement of reexamined U.S. Patent No Re: 33,920; Kidde, its predecessor Maple Chase, and its parent company UTC's unlawful attempts to enforce a knowingly invalid, non-infringed, and fraudulently procured patent; and their unfair competition as set forth in the Complaint and in the Amended Answer to which this Counterclaim and Third Party Complaint is appended.

**RESPONSE:**

Answering paragraph 18 as to Kidde only, admitted that there is a justiciable controversy and that USI has asserted Counterclaims against Kidde and that USI has also asserted a Third Party Complaint against UTC, but denied that USI is entitled to any of the relief which it has requested by way of such Counterclaims or Third Party Complaint.

19.     This Court has subject matter jurisdiction over USI's counterclaims under 28 U.S.C. §§ 1332, 1337, 1338(a) and 1367 and Fed. R. Civ. P. 13.

**RESPONSE:**

Answering paragraph 19 as to Kidde only, admitted that subject matter jurisdiction exists within this Court over USI's counterclaims.  The remaining allegations are denied.

20.     This Court holds general and specific personal jurisdiction over UTC under 15 U.S.C. §§ 4 and 15.

**RESPONSE:**

Answering paragraph 20 as to Kidde only, admitted that Kidde has submitted itself to the jurisdiction of this Court by filing its Complaint against USI in the instant case.  The allegations are otherwise denied.

2

21.     Venue in this District is proper as to UTC pursuant to 15 U.S.C. §§ 5 and 15.

**RESPONSE:**

Answering paragraph 21 as to Kidde only, admitted that venue in this District is proper as

to Kidde.  The allegations are otherwise denied.

22.     Venue in this District is proper as to all parties pursuant to 28 U.S.C. §§ 1391 and
1400(b).

**RESPONSE:**

Answering paragraph 22 as to Kidde only, admitted that venue in this District is proper as

to both Kidde and USI.  The allegations are otherwise denied.

## PARTIES

23.     Counter-Plaintiffs USI are the remaining Defendants in the above-captioned case
and submit to the personal jurisdiction of this Court.  Among other things, USI develops,
manufactures and markets popular priced safety products such as residential hazardous condition
detector alarms including residential smoke and fire ("smoke") detector alarms, residential
carbon monoxide detector alarms, and residential combination smoke and CO detector alarms
and certain other related products.

**RESPONSE:**

Answering paragraph 23 as to Kidde only, admitted that USI is the collective Defendant

in the above-captioned case and that USI has submitted itself to the personal jurisdiction of this

Court.  Admitted that USI markets and sells smoke, CO and combination smoke/CO detector

alarms.  The allegations are otherwise denied.

24.     Counter-Defendant Kidde, the current Plaintiff in the above-captioned action, is a
consumer residential safety product company that is part of UTC Fire and Security ("UTC
F&S"), a multi-billion dollar division of UTC.  Kidde/UTC has twice sued USI in this Court for
alleged patent infringement.  The first suit was brought by Maple Chase Company in 2003 which
was stayed, and subsequently dismissed, pending completion of a reexamination proceeding
conducted by the United States Patent and Trademark Office.  In 2007, Kidde's parent company,
UTC, purchased Maple Chase Company.  However, at the completion of the reexamination
proceeding in 2008, the present action was filed in the name of Maple Chase despite its sale to
UTC.  In December 2008, UTC had Maple Chase assign the patent to Kidde.  Kidde then
substituted itself as the named Plaintiff in this action.

**RESPONSE:**

Answering paragraph 24 as to Kidde only, admitted that Kidde has brought a claim in 2003 against USI in this Court for USI's infringement of United States Patent No. Re: 33,920, which was stayed, and subsequently dismissed, pending completion of a reexamination proceeding conducted by the United States Patent and Trademark Office, and that at the completion of the reexamination proceeding in 2008, the present action was filed in the name of Maple Chase for whom Kidde then substituted itself as the named Plaintiff. The allegations are otherwise denied.

25.     Third party-Defendant UTC, a Fortune® 50 company, is a Delaware corporation and is the 100% owner of Kidde America Inc. (a Delaware corporation), which is 100% owner of KNA Inc. (a Delaware corporation), which is 100% owner of Kidde US Holdings Inc. (a Delaware corporation), which is 100% owner of Kidde Fire Protection Inc. (a Delaware corporation), which is 100% owner of Plaintiff/Counter Defendant Kidde. On December 31, 2007, UTC completed the acquisition of Maple Chase Company, the owner of the FireX brand and merged it into UTC F&S. UTC F&S is the dominant entity worldwide for consumer life and safety products. (Hereinafter, all references to UTC F&S refer to UTC, Kidde, and their subsidiaries, collectively.)

**RESPONSE:**

Answering paragraph 25 as to Kidde only, admitted that UTC is a Delaware corporation and is the 100% owner of Kidde America Inc. (a Delaware corporation), which is 100% owner of KNA Inc. (a Delaware corporation), which is 100% owner of Kidde US Holdings Inc. (a Delaware corporation), which is 100% owner of Kidde Fire Protection Inc. (a Delaware corporation), which is 100% owner of Kidde. Admitted that Kidde completed the acquisition of Maple Chase Company on December 31, 2007 and that Maple Chase owned the FireX® brand name. Kidde further denies that UTC acquired Maple Chase. The remaining allegations are otherwise denied. Kidde objects to USI's vague, overbroad and incorrect definition of "UTC F&S" – a separate and distinct entity which is not even a named party to the instant case.

## I.     INTRODUCTION

26.     Counts One through Four of these Counterclaims are actions for declaratory relief and attorneys fees under 28 U.S.C. § 2201 and 35 U.S.C. § 101 *et seq*.  These counts arise under Title 35 of the U.S. Code and decisional law relating to patent infringement, validity, and enforceability.

**RESPONSE:**

Answering paragraph 26 as to Kidde only, admitted that USI has asserted Counterclaims

against Kidde which purport to arise under Title 35 of the U.S. Code and decisional law relating

to patent infringement, validity, and enforceability, but denied that USI is entitled to any of the

relief which it has requested by way of such Counterclaims.  The allegations are otherwise

denied.

27.     Counts Five through Seven of these Counterclaims are actions for monetary damages and injunctive relief under Section 2 of the Sherman Act and the unfair competition laws of the state of Illinois.  These Counts arise from UTC's and Kidde's unlawful and anticompetitive campaign to monopolize or attempt to monopolize markets for residential smoke detector alarms.  To monopolize or attempt to monopolize these markets, UTC F&S first unlawfully obtained a patent related to residential smoke detector alarms by committing fraud on the USPTO and threatened and attempted to enforce its fraudulently obtained patent.  USI brings Counts Five through Seven to seek compensation for its injuries caused by UTC F&S's unlawful conduct and to restore competition in the affected relevant product and geographic markets

**RESPONSE:**

Answering paragraph 27 as to Kidde only, admitted that USI has asserted Counterclaims

against Kidde which purport to arise under Section 2 of the Sherman Act and the laws of the

state of Illinois, but denied that USI is entitled to any of the relief which it has requested by way

of such Counterclaims.  The allegations are otherwise denied.

## II.     RESIDENTIAL SMOKE DETECTOR ALARM MARKET

28.     Competition in the smoke detector alarm industry has decreased over time through a series of consolidations and exits.  Today, there are only three significant competitors that sell residential smoke detector alarms in the United States: BRK Brands, Inc., USI, and UTC F&S.  The alarms come in various forms such as battery backup, battery operated, and wireless. There are two principal types of technology deployed in smoke detector alarms: (i) ionization and (ii) photoelectric.  Ionization smoke detector alarms utilize an Americium element to detect

the presence of combustion.  Ionization smoke detector alarms generally detect more effectively fast, flaming fires that consume combustible materials rapidly and spread quickly.  Photoelectric smoke detector alarms use a light source to detect the presence of smoke particles.  These smoke detector alarms generally detect more effectively slow, smoldering fires, which linger for hours before resulting in flames.  Combination ionization/photoelectric smoke detector alarms also exist.  Photoelectric smoke detector alarms sell for three times the price of ionization smoke detector alarms.  Ionization smoke detector alarms make up approximately 95% of the sales in the United States, while photoelectric smoke detector alarms and combination ionization/photoelectric smoke detector alarms make up the rest of the sales.  UTC F&S sells all three types of smoke detector alarms.  USI sells ionization and photoelectric smoke detector alarms but not a combination ionization/photoelectric smoke detector alarm.

**RESPONSE:**

Answering paragraph 28 as to Kidde only, admitted that Kidde, USI and BRK sell smoke

detector alarms in the United States.  Admitted that the functional characteristics of photoelectric

and ionization smoke detector alarms as described by USI in paragraph 28 are generally

accurate.  The allegations are otherwise denied.

29.     The three manufacturers (BRK, USI, and UTC F&S) sell residential smoke detector alarms through the electrical distribution ("ED") and retail channels in the United States. Products sold through electrical wholesalers such as Rexal, buying groups, professional contractors, and home builders are sold through the ED channel.  Products sold through big box retailers such as Home Depot and Lowes and independent retailers such as Ace Hardware and True Value are sold through the retail channel.  UTC F&S's FireX brand is the leader in the ED channel and UTC F&S's Kidde brand is the leader in the retail channel.  While the residential smoke detector alarm products may be branded differently in the ED or retail channel, in order to satisfy Underwriters Laboratories Inc. ("UL") standards, the products are virtually identical and interchangeable.  In the end, the residential smoke detector alarm products sold through the ED and retail channels are primarily installed into either new residential homes or residential homes as replacements.  The various smoke detector alarm products are different so there are at least one and possibly five antitrust markets relevant to this action.

**RESPONSE:**

Answering paragraph 29 as to Kidde only, admitted that Kidde, USI and BRK sell smoke

detector alarms in the United States.  Admitted that smoke detector alarms must be UL approved

before being sold in the United States.  The allegations are otherwise denied.

30.     The first relevant antitrust product market is no broader than the "Residential Smoke Detector Alarm Market," the market for residential smoke detector alarms.  Consumers including residential home owners, residential renters, home builders, and home remodelers do

not view commercial smoke detector alarms as substitutes for residential smoke detector alarms. Commercial smoke detector alarms that are tied to a central monitoring system are used in commercial buildings, while residential smoke detector alarms are primarily used in residential homes. The performance of smoke detector alarms is addressed by two UL Standards for Safety-UL 217, Standard for Single and Multiple Station Smoke Alarms; and UL 268, Standard for Smoke Detectors for Fire Protective Signaling Systems. UL 217, single and multiple station alarms, are used in residential homes; while UL 268, smoke detectors for fire protective signaling systems, are used in commercial buildings.

**RESPONSE:**

Answering paragraph 30 as to Kidde only, admitted that UL 217 and UL 268 relate to

smoke detector alarms. The allegations are otherwise denied.

31.    Residential smoke detector alarms cost less than commercial smoke detector alarms. Most manufacturers of commercial smoke detector alarms do not manufacture and/or sell residential smoke detector alarms in the United States. The pricing of commercial smoke detector alarms are distinct from residential smoke detector alarms. There are no substitutes to which consumers would switch in response to a small but significant and non-transitory increase in the price ("SSNIP") for residential smoke detector alarms

**RESPONSE:**

Answering paragraph 31 as to Kidde only, paragraph 31 is denied.

32.    Alternatively, the overall Residential Smoke Detector Alarm Market may be further segmented into four more narrow relevant antitrust product markets consisting of residential ionization, photoelectric, combination ionization/photoelectric, and hush smoke detector alarm markets (the "Residential Ionization Smoke Detector Alarm Market", the "Residential Photoelectric Smoke Detector Alarm Market", the "Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market", "Residential Smoke Detector Hush Alarm Market"). Photoelectric smoke detector alarms cost three times more than ionization smoke detector alarms. Ionization smoke detector alarms are generally detecting more effectively fast, flaming fires that spread quickly, while photoelectric detector smoke alarms detect more effectively slow, smoldering fires. Combination units combine both technologies. There are no substitutes for which consumers would switch in response to a SSNIP for residential ionization, photoelectric, and combination ionization/photoelectric smoke detector alarms.

**RESPONSE:**

Answering paragraph 32 as to Kidde only, paragraph 32 is denied.

33.    The overall Residential Smoke Detector Alarm Market may even be further segmented into a more narrowly defined relevant market for residential smoke detector alarms having a hush, or variable sensitivity, feature to silence the alarm in the presence of nuisance

smoke. Residential smoke detector alarms with the hush feature are typically purchased for installation in areas where nuisance alarms may trigger from non-threatening sources such as smoking or cooking. Residential smoke detectors with the hush feature have specific UL and other code requirements to satisfy in order to be sold for residential use. Specific requirements include the ability to sound a fire/smoke event during hush if a predetermined level of smoke is encountered, to hush for no longer than 15 minutes, to self restore itself to full sensitivity after a hush, and to provide a visual or audible indication that the unit is in hush. Residential smoke detector alarms with the hush feature are more expensive than residential smoke detector alarms without the hush feature. The hush feature may be used in any residential smoke detector alarm including ionization, photoelectric, and combination ionization/photoelectric smoke detector alarms.

**RESPONSE:**

Answering paragraph 33 as to Kidde only, admitted that smoke detectors having a

variable sensitivity feature must be UL approved and meet other requirements before being sold

in the United States. The allegations are otherwise denied.

34. The ability to hinder competition or entry in the Residential Smoke Detector Hush Alarm Market affects the ability of a competitor to compete in the Residential Smoke Detector Alarm Market because retail stores and electrical distributors seek manufactures that offer smoke detector products that can meet the needs of an entire residence, including providing units with hush for installation in kitchens, etc. This is particularly acute in certain localities that require all smoke detectors in a residence to be interconnected to one another such that a fire/smoke condition detected by one alarm cause all others in the dwelling to alarm. A barrier to providing a hush unit would essentially foreclose a seller from competing in these localities. UTC F&S and/or its predecessors have enforced the fraudulently obtained patent against all manufacturers and vendors of residential smoke detector alarms with a hush feature.

**RESPONSE:**

Answering paragraph 34 as to Kidde only, paragraph 34 is denied.

35. The geographic scope of the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market is the United States (sometimes collectively referred herein as "the Relevant Markets"). Because of national safety standards and regulations, a manufacturer of smoke detector alarms cannot simply start selling residential smoke detector alarms in the United States. Rather, to sell in the United States, a manufacturer of residential smoke detector alarms, in particular, ionization alarms, which contain radioactive material, needs to obtain a license from the Nuclear Regulatory Commission ("NRC") and pass extremely rigorous UL testing procedures for each model.

**RESPONSE:**

Answering paragraph 35 as to Kidde only, admitted that smoke detector alarms must be UL approved before being sold in the United States, and that an NRC license is required to sell certain smoke detector alarms in the United States. The allegations are otherwise denied.

36.     UTC F&S dominates the sales of residential smoke detector alarms including ionization, photoelectric, combination ionization/photoelectric, and hush smoke detector alarms in the United States with approximately 65% of the sales in each of the relevant antitrust markets. UTC F&S holds a monopoly or, in the alternative, a dangerous probability of obtaining a monopoly in the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, as well as the Residential Smoke Detector Hush Alarm Market.

**RESPONSE:**

Answering paragraph 36 as to Kidde only, paragraph 36 is denied.

37.     The Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, and Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market are characterized by high barriers to entry and expansion as a result of, among other things, UTC F&S's allegations that its patent portfolio purports to cover technology necessary to manufacture residential smoke detector alarms with a hush feature consistent with UL standards; UTC F&S's unlawful assertion of fraudulently obtained intellectual property rights to control entry and expansion within the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market; UTC F&S's enforcement of fraudulently obtained patents against all of its competitors limited the ability of those competitors to expand production of smoke detector alarms with a hush feature; low profit margins, which discourage all manufacturers of commercial smoke detector alarms not currently in the business of manufacturing and selling residential smoke detector alarms from entering; the need for a NRC license for ionization alarms; and, extremely rigorous UL testing procedures.

**RESPONSE:**

Answering paragraph 37 as to Kidde only, paragraph 37 is denied.

**III.     COUNTERCLAIM DEFENDANTS' ILLEGAL CONDUCT**

38.     Through a continuing pattern of predatory conduct, UTC F&S obtained and maintained a monopoly, or possesses a dangerous probability of obtaining a monopoly in the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination

Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market. As detailed below, UTC F&S obtained this monopoly, or possesses a dangerous probability of obtaining this monopoly, by (a) fraudulently obtaining patents from the USPTO, threatening to enforce those patents, and actually attempting to enforce those patents; (b) consummating at least three acquisitions that resulted in UTC F&S obtaining significant market share in the relevant product and geographic markets; and, (c) engaging in this baseless sham legal action. UTC F&S's anticompetitive conduct harmed competition in the relevant geographic and product markets by among other things, increasing prices of smoke detector alarms with the hush feature, increasing prices of all smoke alarms, and reducing competition, quality, innovation, and consumer choice.

**RESPONSE:**

Answering paragraph 38 as to Kidde only, paragraph 38 is denied.

### A. Maple Chase's Fraudulent Acquisition of Patents from the USPTO

39. Maple Chase fraudulently obtained the '920 reexamination patent, and its predecessor the '797 patent, from the USPTO. As detailed below, Maple Chase deliberately failed to disclose material information, including prior art, at times when that prior art was known to Maple Chase and Maple Chase held a duty to disclose that art to the USPTO. Maple Chase made representations to the USPTO material to the patentability of the '920 reexamination patent, and its predecessor the '797 patent that were false, and Maple Chase knew to be false. The USPTO relied on Maple Chase's false statements in allowing the '920 reexamination patent, and its predecessor the '797 patent, to issue. But for Maple Chase's material false statements and omissions, the claims of the '920 reexamination patent, and its predecessor the '797 patent would not have issued as written.

**RESPONSE:**

Answering paragraph 39 as to Kidde only, paragraph 39 is denied.

### B. History of the '797 Patent, '920 Reexamination Patent, and Attempted Enforcement Against USI

40. United States Patent 4,792,797 issued on December 20, 1988, in the names of William P. Tanguay and James McCrink and purports to relate to certain smoke detectors having variable sensitivity.

**RESPONSE:**

Answering paragraph 40 as to Kidde only, paragraph 40 is admitted.

41. United States Patent No. Re: 33,920 issued on May 12, 1992 as the result of a reissue proceeding in the United States Patent Office instituted by the then owner of the patent, Seatt Corporation, an affiliate of Maple Chase.

**RESPONSE:**

Answering paragraph 41 as to Kidde only, Kidde admits that United States Patent No.

Re: 33,920 issued on May 12, 1992 as the result of a reissue proceeding in the United States

Patent Office instituted by the then owner of the patent, Seatt Corporation.  Kidde is unclear as to

what USI means by "affiliate" and, therefore, objects to that language as vague and ambiguous.

Accordingly, the allegations are otherwise denied.

42.     According to the records of the United States Patent and Trademark Office, after
the purchase of Maple Chase, after the patent had expired, and after the filing of this suit, the
patent was assigned from Maple Chase to Plaintiff Kidde.

**RESPONSE:**

Answering paragraph 42 as to Kidde only, because USI has not provided a copy of the

record of the United States Patent and Trademark Office to which it is referencing, Kidde is

without sufficient information to form a belief as to the allegations presented in paragraph 42 and

therefore denies such allegations.  Kidde admits, however, that it is the properly named party and

sole owner to all of the rights in the patent in suit.

43.     A Request for Reexamination of Re: 33,920 was granted by the United States
Patent & Trademark Office on October 12, 2004 on the basis that "a substantial new question of
patentability affecting claims 1-5 and 7-37" was raised by the prior art in the Reexamination
Request.

**RESPONSE:**

Answering paragraph 43 as to Kidde only, paragraph 43 is admitted.

44.     By statute, Re: 33,920 and any reexamined patent that may issue expired on
March 5, 2007.

**RESPONSE:**

Answering paragraph 44 as to Kidde only, paragraph 44 is admitted.

45.     During Reexamination, claims 18-22 and 25-30 were cancelled in view of the
prior art cited in the Reexamination Request.

**RESPONSE:**

Answering paragraph 45 as to Kidde only, Kidde admits that claims 18-22 and 25-30 were cancelled during the Reexamination of US Re 33,920. Otherwise, denied.

46.     On May 13, 2008, a Reexamination Certificate for Re: 33,920 issued ("the '920 reexamined patent").

**RESPONSE:**

Answering paragraph 46 as to Kidde only, paragraph 46 is admitted.

47.     On June 25, 2008, Maple Chase, although already having been acquired by UTC, filed this complaint in its name as owner of the '920 reexamined patent alleging that Defendants infringe the '920 reexamined patent.

**RESPONSE:**

Answering paragraph 47 as to Kidde only, Kidde denies that UTC acquired Maple Chase. Kidde admits the remaining allegations of paragraph 47.

48.     The Complaint was not only against USI, but also two of its downstream customers, Callas/Kingsley and CEMCO.

**RESPONSE:**

Answering paragraph 48 as to Kidde only, paragraph 48 is admitted.

49.     Subsequent to the filing of this complaint, UTC had Maple Chase assign the patent to Kidde and then had Kidde substitute itself as named plaintiff in this action.

**RESPONSE:**

Answering paragraph 49 as to Kidde only, Kidde denies the allegations presented in paragraph 49.

50.     As early as 1986, USI commenced development and commercialization of smoke detector systems having variable sensitivity (a "hush" feature) incorporating Motorola ASIC chips 14467 and 14468 based on circuitry schematics and instructions provided by Motorola.

**RESPONSE:**

Answering paragraph 50 as to Kidde only, Kidde is without sufficient information to form a belief as to the allegations presented in paragraph 50, and therefore denies such allegations.

12

51.     USI's smoke detectors incorporating a hush feature control sensitivity using off – chip electrical components vastly different than those disclosed and claimed in the patent, control sensitivity in a different way with a different methodology than disclosed and claimed in the patent, and include features and components specifically disclaimed from the scope of the patent during its prosecution and reexamination.

**RESPONSE:**

Answering paragraph 51 as to Kidde only, paragraph 51 is denied.

52.     A reasonable evaluation of USI's products would show that no basis for accusations of infringement of the patent existed.

**RESPONSE:**

Answering paragraph 52 as to Kidde only, paragraph 52 is denied.

53.     On July 23, 1999, James Reilly, Vice President of Finance and Administration of Maple Chase sent a letter to Harvey Grossblatt, President, USI Electric, Inc, enclosing a copy of Re: 33,920, inviting USI Electric to take a license under the patent and or otherwise comment by August 6, 1999.

**RESPONSE:**

Answering paragraph 53 as to Kidde only, paragraph 53 is admitted.

54.     On July 28, 1999, then Chairman of Universal Security Instruments, Inc. Michael Kovens, talked with Mr. Reilly on the telephone as reported in the follow-up letter of August 18, 1999.  In that follow-up letter, Mr. Kovens advised Mr. Reilly that he had not received a copy of the discussed proposed license.

**RESPONSE:**

Answering paragraph 54 as to Kidde only, Kidde is without sufficient information to

form a belief as to the allegations presented in paragraph 54, and therefore denies such

allegations.

55.     No further communications were received from Mr. Reilly.

**RESPONSE:**

Answering paragraph 55 as to Kidde only, Kidde is without sufficient information to

form a belief as to the allegations presented in paragraph 55, and therefore denies such

allegations.

56.     Over three years later, on August 26, 2002, Timothy Dolan, Maple Chase's Vice President and General Counsel, sent a letter again enclosing a copy of Re: 33,920 and demanding that USI Electric respond to another licensing invitation by August 30, 2002.

**RESPONSE:**

Answering paragraph 56 as to Kidde only, Kidde admits that on August 26, 2002,

Timothy Dolan, Maple Chase's Vice President and General Counsel, sent a letter to USI Electric,

that a copy of U.S. Patent No. RE33,920 was enclosed therewith, and that said letter requested a

response from USI by August 30, 2002.  The remaining allegations are denied.

57.     On September 27, 2002, USI's counsel responded to Mr. Dolan denying infringement and explaining that USI's Underwriter's Laboratories ("UL") approved smoke detectors were built according to the Motorola specification sheets and instructions and included different circuitry external to the IC to diminish sensitivity.

**RESPONSE:**

Answering paragraph 57 as to Kidde only, Kidde admits that on September 27, 2002,

USI's counsel sent a response letter to Mr. Dolan, and further admitted that the response letter

states what is written therein.  The remaining allegations are denied, as are any characterizations

or inferences suggesting that any statement provided in the referenced letter is and/or was

accurate or correct.

58.     On November 18, 2002, Maple Chase's outside counsel sent a response letter threatening suit unless USI reached a "business solution" with Maple Chase.  The letter did not provide a substantive explanation regarding the Motorola chip data sheets or specifications, and did not provide any basis or analysis for the accusation that the circuitry of USI's products could be deemed to infringe Re: 33,920.

**RESPONSE:**

Answering paragraph 58 as to Kidde only, Kidde admits that on November 18, 2002,

Maple Chase's counsel sent a response letter to USI's counsel documenting the erroneous

statements which had been set forth in USI's letter of September 27, 2002.  It is further admitted

that the letter of November 18, 2002, indicated that USI had a decision to make as to whether it

desired to proceed with litigation regarding U.S. Patent No. RE33,920, or whether USI instead desired to reach a business resolution to resolve the patent dispute. The remaining allegations are denied.

59.     On January 22, 2003, after an exchange of communications between counsel, Maple Chase presented terms for licensing. In July 2003, Maple Chase's counsel sent a follow-up letter. USI declined to succumb to the threats and pressure from a larger competitor to pay a tribute for products that did not fall with in the scope of the patent.

**RESPONSE:**

Answering paragraph 59 as to Kidde only, Kidde admits that on January 22, 2003, Maple Chase presented terms to USI for licensing and that, in July 2003, Maple Chase's counsel sent USI a follow-up letter. It is further admitted that USI did not accept Maple Chase's proposed licensing terms. The remaining allegations are denied.

60.     On October 14, 2003, Plaintiff filed a Complaint against USI and USI Electric, Inc. in this Court alleging infringement of Re: 33,920 (Civil Action No.: 1:03-cv- 07205 N.D. Ill.).

**RESPONSE:**

Answering paragraph 60 as to Kidde only, paragraph 60 is admitted.

61.     On November 12, 2003, the Court *sua sponte* dismissed the Complaint without prejudice because the Complaint failed to indicate that the Court had jurisdiction over USI and USI Electric, Inc.

**RESPONSE:**

Answering paragraph 61 as to Kidde only, Kidde admits that on November 12, 2003, the Court entered a *sua sponte* Order dismissing the Complaint without prejudice because Maple Chase's allegations regarding jurisdiction and venue were, in the words of the Court, "too general and based on information and belief." The remaining allegations are denied.

62.     On February 2, 2004, Plaintiff filed an Amended Complaint and Motion for Reinstatement. The Amended Complaint added two downstream entities from the Northern District to create jurisdiction and alleged that all of the Defendants were infringing Re: 33,920.

**RESPONSE:**

Answering paragraph 62 as to Kidde only, paragraph 62 is admitted.

63.     Following an initial stay, the Court dismissed Civil Action No.: 1:03-cv-07205 in view of the grant of a Request for Reexamination of the asserted patent on October 20, 2004.

**RESPONSE:**

Answering paragraph 63 as to Kidde only, paragraph 63 is admitted.

64.     The United States Patent & Trademark Office found that certain prior art raised a "substantial new question of patentability" of Re: 33,920.

**RESPONSE:**

Answering paragraph 64 as to Kidde only, paragraph 64 is admitted.

65.     Amongst the prior art relied upon by the United States Patent & Trademark Office in ordering reexamination of Re: 33,920 were the 1980 Motorola specification sheet for MC14466 and the 1984 Motorola specification sheet for MC 14467 ("Motorola specifications sheets"), and the requirements of the industry standards for smoke detectors contained in UL 217 as it existed in 1986. The Motorola specification sheets and UL 217 were prior art known to Maple Chase and its predecessors, the named inventors, and prosecution counsel during the prosecution of both US Re: 33,920 and its predecessor, US Patent No. 4,792,797.

**RESPONSE:**

Answering paragraph 65 as to Kidde only, Kidde admits that in the initial course of

ordering reexamination of U.S. Patent No. RE33,920, the United States Patent & Trademark

Office made reference to the Motorola specification sheets and the UL 217 standard. The

remaining allegations are denied.

66.     Since 1987, USI has continuously produced its smoke detector systems having variable sensitivity, and Maple Chase and/or its predecessors have taken no action until the filing and serving of the prior lawsuit against Defendants in 2004. Moreover, the first contact from Maple Chase regarding Re: 33,920 was not until 1999, more than a decade after USI began selling its UL compliant variable sensitivity smoke detectors.

**RESPONSE:**

Answering paragraph 66 as to Kidde only, Kidde is without sufficient information to form a belief as to the allegations presented in paragraph 66, and therefore denies such allegations.

67.    Because the accused USI products are based on the prior art Motorola chip specifications and use off-chip circuitry that is vastly different and used in a vastly different way than what is disclosed and claimed in the patent to achieve diminished sensitivity in a manner disclaimed in the patent; and because of the silence, inactivity, and acquiescence of the "patent owners" to USI for more than fifteen years; USI continuously produced, imported, and sold smoke detector models incorporating variable sensitivity.

**RESPONSE:**

Answering paragraph 67 as to Kidde only, paragraph 67 is denied.

68.    Because the United States Patent & Trademark Office found a substantial new question of patentability as to the claims of the patent in view of prior art some of which was raised in USI's defenses to the 2004 suit and all of which being prior art known to Plaintiff, its predecessors, the inventors and their patent counsel, which was not disclosed to the United States Patent & Trademark Office during prosecution of the predecessors of the '920 reexamined patent, USI continued to produce, import, and sell smoke detectors incorporating variable level sensitivity.

**RESPONSE:**

Answering paragraph 68 as to Kidde only, paragraph 68 is denied.

69.    The '920 reexamined patent and its predecessors expired on March 7, 2007.

**RESPONSE:**

Answering paragraph 69 as to Kidde only, paragraph 69 is denied.

70.    Despite the cancellation of claims during reexamination, which established "but for" materiality of the prior art, UTC had its Maple Chase unit re-file an infringement suit against USI.

**RESPONSE:**

Answering paragraph 70 as to Kidde only, Kidde admits that infringement claims against USI were reinstated after the PTO confirmed the patentability of claims 1-17, 23, 24 and 31-38, otherwise, denied.

17

71.     Despite the clear and unmistakable non-infringement of USI's products given any reasonable analysis, UTC had its Maple Chase unit re-file an infringement suit against USI.

**RESPONSE:**

Answering paragraph 71 as to Kidde only, paragraph 71 is denied.

### D.     UTC's Acquisitions Created a Firm With Market Power

72.     UTC entered the Residential Smoke Detector Alarm Market in 2003 with the acquisition of Chubb, an international fire protection firm.  In April 2005, UTC expanded its market share with the acquisition of Kidde, and created UTC F&S.  On December 31, 2007, UTC F&S acquired Maple Chase Co., manufacturers of the FireX brand smoke detector alarms. UTC F&S controls 65% of the Residential Smoke Alarm Market.  UTC F&S dominates sales of residential smoke detector alarms in the retail channel and dominates in sales of residential smoke detector alarms in the ED channel.  UTC F&S acquired 65% of these markets through aggressive acquisitions, and obtained or maintained a monopoly position, or in the alternative, possesses a dangerous probability of obtaining a monopoly position in the relevant product and geographic markets.  UTC F&S now seeks to exercise its monopoly power through vexatious patent infringement litigation, relying on a fraudulently obtained patent in an attempt to force USI from the relevant product and geographic markets.

**RESPONSE:**

Answering paragraph 72 as to Kidde only, paragraph 72 is denied.

### E.     Counterclaim Defendants' Sham Legal Action

73.     In addition to acquiring the '920 reexamination patent, and its predecessor the '797 patent by defrauding the USPTO, UTC F&S attempted to enforce the '920 reexamination patent against USI in an attempt to monopolize the relevant antitrust markets.  UTC F&S knew when Maple Chase filed the present action that the '920 reexamination patent had been obtained by defrauding the USPTO.  UTC F&S also knew this legal action was subjectively and objectively baseless when filed – that is, no reasonable litigant could have realistically expected success on the merits absent fraud on the court.  UTC F&S abused government process in an anticompetitive manner by initiating this lawsuit with the specific intent to obtain and hold monopoly power without concern for the outcome of this legal action and to disrupt the business of USI to the detriment of competition, USI's customers, and of all customers of residential smoke detector alarms.

**RESPONSE:**

Answering paragraph 73 as to Kidde only, paragraph 73 is denied.

## IV.   COUNTERCLAIM DEFENDANTS' PREDATORY CONDUCT INJURED USI AND COMPETITION

74.   UTC F&S's unlawful and anticompetitive conduct enabled it to obtain and maintain monopoly power, or alternatively, to create a dangerous probability of obtaining monopoly power in the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market; and Residential Smoke Detector Hush Alarm Market, UTC F&S's conduct injured both USI and competition in those markets.

**RESPONSE:**

Answering paragraph 74 as to Kidde only, paragraph 74 is denied.

75.   UTC F&S's predecessor in interest, Maple Chase Company was, for decades, one of the largest manufacturers and suppliers of residential smoke detectors in the world, up until Kidde acquired it.  In the mid-1980s, most manufacturers of residential smoke detectors began developing and selling smoke detectors having a temporary silence or hush feature.  At this time, there were numerous U.S. manufacturers and vendors of residential smoke detector alarms and prices of smoke detector alarms were relatively low.  In an effort to stifle competition, artificially raise prices, and create a barrier to entry and expansion, Maple Chase began a campaign of asserting the patent, threatening competitors and chip vendors, and suing its competitors such as Fyrnetics, BRK, Dicon, and USI for infringement of Maple Chase patents.  These lawsuits were brought even if the competitive products did not infringe Maple Chase's patents.  For example, Maple Chase forced Fyrnetics to pay a substantial royalty to avoid an infringement suit on the '920 patent despite the fact that Fyrnetics' products were two button (meaning separate test and hush buttons) that could not under any construction of the patent be deemed to be an infringing product.  With respect to BRK, Maple Chase entered into a settlement agreement that limited Maple Chase's rivals' ability to expand and compete.

**RESPONSE:**

Answering paragraph 75 as to Kidde only, Kidde admits that Maple Chase manufactured

and sold smoke detectors up until it was acquired by Kidde.  It is further admitted that Maple

Chase filed lawsuits against Fyrnetics, BRK, Dicon and USI for infringement of the '920 patent,

and that settlement agreements were reached with Fyrnetics and BRK.  The remaining

allegations are denied.

76.   As part of this lawsuit, Maple Chase filed patent infringement claims against two of USI's customers with the specific intent to monopolize or attempt to monopolize the Relevant Markets.  Threats of patent litigation and/or patent infringement lawsuits against USI's customers, based on a fraudulently procured patent with a reasonable likelihood that such threats

will cause the customers to cease dealing with their supplier, unreasonably restrains competition, and restricts new entry and limits expansion by competitors. This is the kind of economic coercion that the antitrust laws are intended to prevent. USI has been equally injured and it has lost business and customers. Without customers, USI has no business.

**RESPONSE:**

Answering paragraph 76 as to Kidde only, Kidde admits that Maple Chase filed claims

against two of USI's customers for infringement of the '920 reexamined patent. The remaining

allegations are denied.

77.     In addition to Maple Chase filing lawsuits against USI and two of USI's customers, Maple Chase represented to Allegro Microsystems, Inc. ("Allegro"), a manufacturer of smoke detector integrated circuits ("ICs") that the '920 patent covered ionization and photoelectric smoke detector ICs, which included a built in silence feature at pin 1. Allegro refused to sell ICs to USI unless USI agreed not to use the built-in hush feature at pin 1. This refusal to deal forced USI to use expensive off-chip components to build hush units (raising USI's costs) and also forced USI to delay its new hush feature product line using these particular ICs until the patent expired. This delay harmed competition in the Relevant Markets generally and USI, in particular, with respect to loss of potential sales and other damages. Neither the Allegro ICs with a built-in silence feature nor the smoke detectors built using those ICs are covered by the patent. As such, Maple Chase's representation to Allegro that the IC was covered by the '920 patent, and prohibiting Allegro from selling ICs to competitors such as USI absent a license from Maple Chase is another act of asserting and using a fraudulently obtained patent to the detriment of competition, consumers, and USI.

**RESPONSE:**

Answering paragraph 77 as to Kidde only, Kidde is without sufficient information to

form a belief as to the allegations presented in the first, second and third sentences of paragraph

77, and therefore denies such allegations. The remaining allegations are denied.

78.     USI develops, markets, and sells residential smoke detector alarms. In addition, USI made substantial investments to develop and sell residential smoke detector alarms, including residential smoke detector alarms with a hush feature.

**RESPONSE:**

Answering paragraph 78 as to Kidde only, Kidde admits that USI markets and sells

smoke detector alarms, including smoke detector alarms with a variable sensitivity feature. The

allegations are otherwise denied.

20

79.     Through this unlawful attempt to enforce this fraudulently obtained patent, and this baseless litigation, UTC F&S and/or its predecessors sought and seek to force USI to exit the relevant product and geographic markets, and prevent other firms from entering these markets. UTC F&S sought to keep USI out of the Relevant Markets, continues to seek to force USI to exit the Relevant Markets, continues to limit USI's ability to expand in the Relevant Markets by imposing additional litigation costs on USI and USI's customers. The cost of defending the various litigations brought by UTC F&S and/or its predecessors is not just related to monetary concerns. That being said, USI's legal fees are significant and impact its ability to compete in the Relevant Markets as money is being diverted to defending litigation rather than developing innovative products. USI is put in the position of operating its business under a cloud of uncertainty that limits its ability to deal with customers and suppliers.

**RESPONSE:**

        Answering paragraph 79 as to Kidde only, paragraph 79 is denied.

80.     The foregoing and other anticompetitive effects from UTC F&S's unlawful actions harmed, and continue to harm, consumers in each of the relevant antitrust markets. UTC F&S' predecessors in interest were successful in raising the prices of residential smoke detector alarms with the hush feature and all residential smoke detectors as well as reducing competition and innovation.

**RESPONSE:**

        Answering paragraph 80 as to Kidde only, paragraph 80 is denied.

81.     Through its unlawful conduct, UTC F&S monopolized or attempted to monopolize the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market. As a result of UTC F&S's conduct, UTC F&S sells approximately 65% of the residential smoke detector alarms in the United States. In addition, through this sham legal action, which was filed five years ago, UTC F&S attempted to exclude USI from the U.S. market.

**RESPONSE:**

        Answering paragraph 81 as to Kidde only, paragraph 81 is denied.

82.     As a result of UTC F&S's misconduct, USI faces either (a) paying supracompetitive license royalties or settlement fees to UTC F&S or (b) incurring huge litigation expenses and losing business opportunities through UTC F&S's threats. UTC F&S's conduct prevents USI from fully competing in the marketplace, thereby injuring consumers and competition in the Residential Smoke Detector Alarm Market and other submarkets.

**RESPONSE:**

        Answering paragraph 82 as to Kidde only, paragraph 82 is denied.

83.     Through its monopolization or attempted monopolization of the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market, UTC F&S injured competition and consumers by, among other things, inflating prices and decreasing competition, quality, and innovation for residential smoke detector alarms.

**RESPONSE:**

Answering paragraph 83 as to Kidde only, paragraph 83 is denied.

### COUNT 1
### JUDGMENT OF NON-INFRINGEMENT

84.     Counterclaim-Plaintiff USI hereby repeats and realleges the allegations contained in paragraphs 17 through 83.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 83.

85.     None of USI's current or former smoke detection systems, infringe any of the claims of the '920 reexamined patent.

**RESPONSE:**

Answering paragraph 85 as to Kidde only, paragraph 85 is denied.

86.     Counterclaim-Plaintiff USI's business has been, and continues to be, harmed by Kidde and UTC's baseless allegations of infringement of the '920 reexamined patent.

**RESPONSE:**

Answering paragraph 86 as to Kidde only, paragraph 86 is denied.

### COUNT 2
### JUDGMENT OF INVALIDITY

87.     Counterclaim-Plaintiff USI hereby repeats and realleges the allegations contained in paragraphs 17 through 86.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 86.

88.     The '920 reexamined patent is invalid for failure to comply with the requirements of 35 U.S.C. §101 *et seq,* including at least 35 U.S.C. §§ 102 and 103 as being anticipated or obvious in view of prior art and/or prior invention.

**RESPONSE:**

Answering paragraph 88 as to Kidde only, paragraph 88 is denied.

89.    Counterclaim-Plaintiff USI's business has been, and continues to be, harmed by Kidde and UTC's attempted assertion of an invalid patent.

**RESPONSE:**

Answering paragraph 89 as to Kidde only, paragraph 89 is denied.

## COUNT 3
## JUDGMENT OF UNENFORCEABILITY
## (INEQUITABLE CONDUCT)

90.    Counterclaim-Plaintiff USI hereby repeats and realleges the allegations contained in paragraphs 17 through 89.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 89.

91.    The '920 reexamined patent identifies William P. Tanguay and James McCrink as co-inventors and purports on its face to be assigned to Seatt Corporation.

**RESPONSE:**

Answering paragraph 91 as to Kidde only, paragraph 91 is admitted.

92.    The '920 reexamined patent identifies Niro, Scavone, Haller & Niro as the "Attorney, Agent, or Firm" that prosecuted Re: 33,920.

**RESPONSE:**

Answering paragraph 92 as to Kidde only, paragraph 92 is admitted.

93.    Both Figure 2 and the written specification of the '920 reexamined patent specifically identify the Motorola MC14467-P1 as being incorporated into the patent.

**RESPONSE:**

Answering paragraph 93 as to Kidde only, paragraph 93 is admitted.

94.    During the prosecution of the predecessors of the '920 reexamined patent the Motorola data sheets, specification sheets, and/or catalog sheets for the Motorola MC 14467-P1 were not provided to the U.S. Patent and Trademark Office by Maple Chase (or its predecessors).

**RESPONSE:**

Answering paragraph 94 as to Kidde only, because USI has not provided a copy of the particular "sheets" to which it is referencing, Kidde is without sufficient information to form a belief as to the allegations presented in paragraph 94 and therefore denies such allegations.

95. The specification sheet for the Motorola MC14467 circuit teaches the use of the circuit in a "Low-Cost Smoke Detector."

**RESPONSE:**

Answering paragraph 95 as to Kidde only, because USI has not provided a copy of the particular specification sheet to which it is referencing, Kidde is without sufficient information to form a belief as to the allegations presented in paragraph 95 and therefore denies such allegations.

96. The Motorola specification sheets detail components and circuitry for constructing a smoke detector having features, attributes and components which were more material to the patentability of the claims than the references provided to the Examiner by Maple Chase and/or its predecessors, inventors William Tanguay, or James McCrink, and prosecution counsel as confirmed by the order granting Reexamination of US Re: 33,920.

**RESPONSE:**

Answering paragraph 96 as to Kidde only, because USI has not provided a copy of the particular "Motorola specification sheets" to which it is referencing, Kidde is without sufficient information to form a belief as to the allegations presented in paragraph 96 and therefore denies such allegations. The remaining allegations are denied.

97. UL 217 section 36 discusses the requirements and settings for variable sensitivity in smoke detectors which was more material to the patentability of one or more claims of the predecessors of the '920 reexamined patent, as confirmed by the cancellation of claims during the Reexamination proceeding, and not cumulative of the references provided to the Examiner by Maple Chase and/or its predecessors, inventors William Tanguay, or James McCrink, and prosecution counsel.

**RESPONSE:**

Answering paragraph 97 as to Kidde only, Kidde admits that UL 217 section 36 discusses the requirements and settings for variable sensitivity in smoke detectors. The remaining allegations are denied.

98.     Maple Chase and/or its predecessors, inventors William Tanguay, and James McCrink, and prosecution counsel each had a duty to disclose material information to the United States Patent & Trademark Office.

**RESPONSE:**

Answering paragraph 98 as to Kidde only, Kidde denies the allegations of paragraph 98 on the basis that the allegation is not tied to any particular patent application pending before the PTO.

99.     Maple Chase and/or its predecessors, inventors William Tanguay, and James McCrink, and prosecution counsel were aware of the materiality of the teachings in the Motorola specification sheets and UL 217 specifications and intentionally failed to disclose those materials with the intent to deceive the United States Patent & Trademark Office into allowing U.S. Patent No. Re: 33,920 and/or its predecessor US Patent No. 4,792,797 to issue.

**RESPONSE:**

Answering paragraph 99 as to Kidde only, paragraph 99 is denied.

100.    The materiality of the information contained in the prior art Motorola MC 14467 data sheets and specifications is undeniable in view of the United States Patent & Trademark Office's grant of a Request for Reexamination based on this prior art and other information in finding a substantial new question of patentability as to the claims.

**RESPONSE:**

Answering paragraph 100 as to Kidde only, paragraph 100 is denied.

101.    The high materiality of the information contained in the UL 217 specification is undeniable in view of the cancellation of claims 18-22 and 25-30 during the Reexamination.

**RESPONSE:**

Answering paragraph 101 as to Kidde only, paragraph 101 is denied.

102.    An intent to deceive the United States Patent & Trademark Office can be inferred from the high materiality of the prior art known to Maple Chase, the inventors, and prosecution counsel which was not disclosed during the prosecution of the predecessors of the '920 reexamined patent. Upon information and belief, Maple Chase, the inventors, and prosecution

counsel intended to deceive the United States Patent & Trademark Office by withholding this highly material information.

**RESPONSE:**

Answering paragraph 102 as to Kidde only, paragraph 102 is denied.

103. The intentional withholding of knowingly material information from the United States Patent & Trademark Office during the prosecution of the predecessors of the '920 reexamined patent renders the '920 reexamined patent unenforceable for inequitable conduct.

**RESPONSE:**

Answering paragraph 103 as to Kidde only, paragraph 103 is denied.

104. Inequitable conduct cannot be cured through Reexamination.

**RESPONSE:**

Answering paragraph 104 as to Kidde only, Kidde objects to the allegation of paragraph

104 as being a statement of law rather than fact, therefore, denied.

105. Counter-Plaintiff USI's business has been, and continues to be, harmed by Kidde and UTC's baseless allegations of infringement of a knowingly unenforceable patent.

**RESPONSE:**

Answering paragraph 105 as to Kidde only, paragraph 105 is denied.

### COUNT 4
### JUDGMENT OF UNENFORCEABILITY
### (FRAUD ON THE PATENT OFFICE)

106. Counter-Plaintiff USI hereby repeats and realleges the allegations contained in paragraphs 17 through 105.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 105.

107. The intentional withholding of material prior art by those individuals with a duty to disclose information constitutes fraud on the United States Patent & Trademark Office when "but for" the non-disclosure the PTO would not have issued the patent.

**RESPONSE:**

Answering paragraph 107 as to Kidde only, paragraph 107 is denied.

108.    As demonstrated by the rejection in view of the withheld prior art and the cancellation of claims 18-22 and 25-30 during the Reexamination proceeding, those claims would not have issued "but for" the concealment of the prior art from the Examiner during the original prosecution of the patent and its reissue.

**RESPONSE:**

Answering paragraph 108 as to Kidde only, paragraph 108 is denied.

109.    The successful deception about the prior art, including the UL 217 standard, induced the United States Patent & Trademark Office to issue the patent, thus becoming an unwitting collaborator in hindering competition through the existence and enforcement of a knowingly invalid patent.

**RESPONSE:**

Answering paragraph 109 as to Kidde only, paragraph 109 is denied.

110.    Counterclaim Plaintiff USI's business has been, and continues to be, harmed by Kidde and UTC's baseless allegations of infringement of a patent procured by fraud on the United States Patent & Trademark Office.

**RESPONSE:**

Answering paragraph 110 as to Kidde only, paragraph 110 is denied.

## COUNT 5
## MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT: *WALKER PROCESS*

111.    USI incorporates the allegations of paragraphs 17 through 110 as set forth here in their entirety.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 110.

112.    UTC F&S achieved monopolies in the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market, and by fraudulent omissions and misrepresentations in the filing and prosecution of the '920 Reexamination Patent and its predecessor the '797 patent, as well as efforts to enforce these fraudulently obtained patents, UTC F&S obtained and held monopolies in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**RESPONSE:**

Answering paragraph 112 as to Kidde only, paragraph 112 is denied.

113.    Alternatively, by UTC F&S's fraudulent omissions, misrepresentations and efforts to enforce its fraudulently obtained patents, UTC F&S attempted to monopolize the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market with the specific intent to do so, and there is a dangerous probability that UTC F&S will succeed in obtaining monopoly power. This conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

**RESPONSE:**

Answering paragraph 113 as to Kidde only, paragraph 113 is denied.

114.    UTC F&S is engaged in interstate and foreign commerce, and the majority of its sales occur in such commerce.

**RESPONSE:**

Answering paragraph 114 as to Kidde only, admitted that Kidde is engaged in interstate

commerce and that Kidde product sales occur by way of such commerce. The allegations are

otherwise denied.

115.    As a direct and proximate result of UTC F&S's unlawful conduct, competition in the relevant markets has been harmed through higher prices, reduced competition, quality, innovation, and consumer choice, to the detriment of consumers.

**RESPONSE:**

Answering paragraph 115 as to Kidde only, paragraph 115 is denied.

116.    As a direct and proximate result of UTC F&S's unlawful conduct, USI has been injured in business or property in an amount not yet determined but to be established at trial. Such damages include, but are not limited to: lost profits; loss of customers and potential customers; loss of goodwill; and, attorneys' fees and other legal expenses.

**RESPONSE:**

Answering paragraph 116 as to Kidde only, paragraph 116 is denied.

117.    Unless UTC F&S's unlawful conduct is enjoined, UTC F&S's anticompetitive conduct will continue and USI will suffer immediate and irreparable injury for which USI will lack any remedies at law. USI believes that UTC F&S will continue to act as alleged herein unless the Court enjoins such actions.

28

**RESPONSE:**

Answering paragraph 117 as to Kidde only, paragraph 117 is denied.

## COUNT 6
## MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT: *HANDGARDS*

118.    USI incorporates the allegations of paragraphs 17 through 117 as set forth here in their entirety.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 117.

119.    UTC F&S obtained monopolies in the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market and by sham litigation and other conduct set forth above, UTC F&S obtained and held monopolies in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**RESPONSE:**

Answering paragraph 119 as to Kidde only, paragraph 119 is denied.

120.    Alternatively, by sham litigation and other conduct, UTC F&S attempted to monopolize the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market with the specific intent to do so, and there is a dangerous probability that UTC F&S will succeed in obtaining monopoly power.  This conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

**RESPONSE:**

Answering paragraph 120 as to Kidde only, paragraph 120 is denied.

121.    UTC F&S is engaged in interstate and foreign commerce, and the majority of its sales occur in such commerce.

**RESPONSE:**

Answering paragraph 121 as to Kidde only, admitted that Kidde is engaged in

interstate commerce and that Kidde product sales occur by way of such commerce.

The allegations are otherwise denied.

122.    As a direct and proximate result of UTC F&S's unlawful conduct, competition in the relevant product and geographic markets has been harmed through higher prices and reduced competition, quality, innovation, and consumer choice to the detriment of consumers.

**RESPONSE:**

Answering paragraph 122 as to Kidde only, paragraph 122 is denied.

123.    As a direct and proximate result of UTC F&S's unlawful conduct, USI has been injured in business or property in an amount not yet determined but to be established at trial. Such damages include, but are not limited to: lost profits; loss of customers, potential customers, suppliers, and potential suppliers; loss of goodwill; and, attorneys' fees and other legal expenses.

**RESPONSE:**

Answering paragraph 123 as to Kidde only, paragraph 123 is denied.

124.    Unless UTC F&S's unlawful conduct is enjoined, UTC F&S's anticompetitive conduct will continue and USI will suffer immediate and irreparable injury for which USI will lack any remedies at law.  USI believes that UTC F&S will continue to act as alleged herein unless the Court enjoins such actions.

**RESPONSE:**

Answering paragraph 124 as to Kidde only, paragraph 124 is denied.

## COUNT 7
## VIOLATIONS OF THE ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. 10/3 (3)

125.    USI incorporates the allegations of paragraphs 17 through 124 as set forth here in their entirety.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 124.

126.    This Count is brought under 740 Ill. Comp. Stat. 10/7 (2) (2008) for injunctive relief and treble damages.

**RESPONSE:**

Answering paragraph 126 as to Kidde only, admitted that USI's counterclaim

purports to arise under 740 Ill. Comp. Stat. 10/7 (2), but denied that USI is entitled to any of the

relief which it has requested.

127.    UTC F&S willfully monopolized the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market in Illinois and in the United States.  This conduct constitutes a violation of 740 Ill. Comp. Stat. 10/3 (3) and Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants willfully maintained, extended, and leveraged their monopoly power by fraudulently obtaining patent rights; attempting to enforce fraudulent patents; and, by sham litigation and other conduct as set forth above.

**RESPONSE:**

Answering paragraph 127 as to Kidde only, paragraph 127 is denied.

128.    Alternatively, by fraudulent omission, fraudulent enforcement, sham litigation and other conduct, UTC F&S attempted to monopolize the Residential Smoke Detector Alarm Market, Residential Ionization Smoke Detector Alarm Market, Residential Photoelectric Smoke Detector Alarm Market, Residential Combination Ionization/Photoelectric Smoke Detector Alarm Market, and Residential Smoke Detector Hush Alarm Market with the specific intent to do so, and there is a dangerous probability that UTC F&S will succeed in obtaining monopoly power.  This conduct violates 740 Ill. Comp. Stat. 10/3 (3) and Section 2 of the Sherman Act, 15 U.S.C. § 2.

**RESPONSE:**

Answering paragraph 128 as to Kidde only, paragraph 128 is denied.

129.    The foregoing acts and practices and the continuing course of UTC F&S's anticompetitive conduct harmed and continue to harm USI and competition in Illinois and elsewhere.

**RESPONSE:**

Answering paragraph 129 as to Kidde only, paragraph 129 is denied.

130.    UTC F&S's anticompetitive and exclusionary conduct directly and proximately caused injury to USI's business and property as set forth above.  USI's injury is of the type this law intends to prohibit.  Unless the activities set forth above are enjoined, USI will suffer immediate and irreparable injury for which USI will lack any remedy at law.  USI believes that UTC F&S will continue to do the acts alleged herein unless the Court enjoins UTC F&S.

**RESPONSE:**

Answering paragraph 130 as to Kidde only, paragraph 130  is denied.

**COUNT 8**
**UNFAIR COMPETITION**

131.    Counter-Plaintiff USI hereby repeats and realleges the allegations contained in paragraphs 17 through 130.

**RESPONSE:**

Kidde hereby incorporates its answers to paragraphs 17 through 130.

132.    UTC F&S's threats and coercion which caused Allegro to refuse to do business with USI, e.g., supply smoke detectors ICs, absent an agreement to not use the built-in hush feature was an act of unfair competition.  Specifically, UTC F&S's predecessor in interest knowingly and in bad faith asserted the patent covered any and all uses of the built-in hush feature and that it would either sue Allegro as an infringer, cease doing business with Allegro, or seek some other retribution against Allegro unless it refused to allow competitors to use the built-in hush feature absent approval from them.  UTC F&S's predecessor knew USI wanted to do business with Allegro use of ICs in its hush and non-hush units, toritiously interfered with this business expectancy and  relationship, resulting in damage to USI by virtue or increased production costs to provide off-chip components to build hush units that complied with UL 217.

**RESPONSE:**

Answering paragraph 132 as to Kidde only, paragraph 132 is denied.

133.    UTC F&S's attempt to compete unfairly and hinder competition and commerce through intentional and tortious interference with USI's business relationships and expectancies in bad faith violates Illinois law.

**RESPONSE:**

Answering paragraph 133 as to Kidde only, paragraph 133 is denied.

134.    Counter-Plaintiff USI's business has been, and continues to be, harmed by UTC F&S's actions.

**RESPONSE:**

Answering paragraph 134 as to Kidde only, paragraph 134 is denied.

### KIDDE'S AFFIRMATIVE DEFENSES TO
### DEFENDANTS' SECOND AMENDED COUNTERCLAIMS

### FIRST AFFIRMATIVE DEFENSE

USI has failed to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

USI's Second Amended Counterclaims are barred by the applicable statutes of limitations

and/or statutes of repose.

### THIRD AFFIRMATIVE DEFENSE

USI's Second Amended Counterclaims are barred by laches, waiver and/or estoppel.

### FOURTH AFFIRMATIVE DEFENSE

USI's Second Amended Counterclaims against Kidde are barred by Noerr-Pennington immunity.

### FIFTH AFFIRMATIVE DEFENSE

Kidde has at all times acted in accordance with applicable law, including all relevant provisions of the Sherman Act and 740 Ill. Comp. Stat. 10/1 *et seq.*

### SIXTH AFFIRMATIVE DEFENSE

USI has not sustained any injury within the meaning of the Sherman Act, 740 Ill. Comp. Stat. 10/1 *et seq*, or any common law tort principles.

### SEVENTH AFFIRMATIVE DEFENSE

Any injury sustained by USI was not caused in fact, or proximately caused, by the violations alleged in USI's Second Amended Counterclaims.

### EIGHTH AFFIRMATIVE DEFENSE

USI's Second Amended Counterclaims are barred, in whole or in part, by its failure to mitigate alleged damages.

### NINTH AFFIRMATIVE DEFENSE

USI has failed to satisfy its burden of defining and establishing appropriate relevant product and geographic markets.

## PRAYER FOR RELIEF

WHEREFORE, Kidde respectfully requests that judgment be entered in its favor and against USI with respect to the counterclaims brought by USI. Kidde further requests that it be granted all of the relief requested in its Complaint against all named defendants.

## JURY DEMAND

Kidde hereby respectfully requests a trial by jury on all issues triable to a jury in this case.

Dated: November 13, 2009        Respectfully Submitted,

WALTER KIDDE PORTABLE
EQUIPMENT, INC.

By: _/s/ John D. Harkrider_____
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone:    212-728-2200
Facsimile:    212-728-2201

Matthew J. Becker
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103-3702
Telephone:    860-275-8100
Facsimile:    860-275-8101

Timothy J. Haller
Paul K. Vickrey
Frederick C. Laney
Robert A. Conley
Laura A. Kenneally
NIRO, SCAVONE, HALLER & NIRO
181 W. Madison Street, Suite 4600
Chicago, IL 60602
Telephone:    312-236-0733
Facsimile:    312-236-1471

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify than on November 13, 2009, I electronically filed the foregoing WALTER KIDDE PORTABLE EQUIPMENT, INC.'S ANSWER TO USI'S SECOND AMENDED COUNTERCLAIMS with the Clerk of Court using the CM/ECF System, which shall send notification of such filing to the following:

| William Eugene Bradley | william.bradley@cahnsamuels.com |
|---|---|
| Maurice U. Cahn | maurice.cahn@cahnsamuels.com |
| Donald F. Engel | chicagolaw@uscounsel.com |
| Corey D. Mack | corey.mack@cahnsamuels.com |

*Attorneys for Defendants/Counter-Plaintiffs Universal Security Instruments, Inc. and USI Electric, Inc.*

/s/ John D. Harkrider